2006 ND 84

STATE of North Dakota ex rel. Wayne STENEHJEM, Attorney General, Plaintiff and Appellee

v.

FREEEATS.COM, INC., dba The FreeEats Companies, ccAdvertising, ccAdvertising.biz, ccAdvertising.Info, ElectionResearch.com, FECads.com, and FECResearch.com, Defendant and Appellant.

No. 20050171.

Supreme Court of North Dakota.

April 21, 2006.

James Patrick Thomas (argued), Assistant Attorney General, Parrell D. Grossman (appeared), Assistant Attorney General, Office of Attorney General, Bismarck, ND, and Wayne K. Stenehjem (appeared), Attorney General, Office of Attorney General, Bismarck, ND, for plaintiff and appellee.

Patrick J. Ward (argued), Lawrence E. King (appeared), Zuger Kirmis & Smith, Bismarck, ND, Emilio W. Cividanes (appeared), Venable, L.L.P., Washington, DC, David H. Bamberger (on brief), and James P. Rathvon (on brief), DLA Piper Rudnick Gray Cary, U.S., L.L.P., Washington, DC, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] FreeEats.com, Inc. ("FreeEats") has appealed from a summary judgment finding FreeEats in violation of North Dakota's telephone solicitation statutes and imposing civil penalties, attorney fees, costs, and disbursements. We affirm, concluding North Dakota's prohibition against placement of political polling calls using an automatic dialing—announcing device is not preempted by federal law.

I

[¶ 2] FreeEats is based in Herndon, Virginia, and conducts telephone surveys and polling services. In August 2004, FreeEats placed numerous political polling calls from its call center in Ashburn, Virginia, to residences in North Dakota. FreeEats employed an automatic dialing-announcing device to place the calls, and all of the calls used prerecorded messages with no live person on the line.

[¶ 3] On September 17, 2004, the State brought this action against FreeEats seeking civil penalties for violations of N.D.C.C. § 51–28–02. FreeEats admitted it made the automated calls to North Dakota residents, but argued application of N.D.C.C. § 51–28–02 to interstate political polling calls was preempted by federal law. On cross-motions for summary judgment, the district court concluded that application of N.D.C.C. § 51–28–02 was not preempted by federal law and that the calls placed by FreeEats to North Dakota residents violated the statute. Judgment was entered ordering FreeEats to pay $10,000 in civil penalties and $10,000 in attorney fees, costs, and disbursements. FreeEats has appealed, alleging the district court erred in concluding that federal law did not preempt application of N.D.C.C. § 51–28–02 to interstate political polling calls.

II

[¶ 4] Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from the undisputed facts, or if the only issues to be resolved are

questions of law. *Wheeler v. Gardner,* 2006 ND 24, ¶ 8, 708 N.W.2d 908; *Jacob v. Nodak Mut. Ins. Co.,* 2005 ND 56, ¶ 11, 693 N.W.2d 604. Summary judgment is appropriate if the issues in the case are such that resolution of any factual disputes will not alter the result. *Jacob,* at ¶ 11; *Tibert v. Slominski,* 2005 ND 34, ¶ 8, 692 N.W.2d 133. Whether the trial court properly granted summary judgment is a question of law that we review de novo on the entire record. *Wheeler,* at ¶ 8; *Heng v. Rotech Med. Corp.,* 2004 ND 204, ¶ 9, 688 N.W.2d 389.

[¶ 5] In this case there are no disputed issues of material fact, and the sole question presented involves interpretation of statutes. Interpretation and application of a statute is a question of law, which is fully reviewable on appeal. *Wheeler,* 2006 ND 24, ¶ 10, 708 N.W.2d 908; *Smith v. Hall,* 2005 ND 215, ¶ 15, 707 N.W.2d 247. Accordingly, this case was appropriate for resolution on a motion for summary judgment.

### III

[¶ 6] The sole question presented on appeal is whether federal law preempts the application of N.D.C.C. § 51–28–02 to automated political polling calls made from Virginia to residents in North Dakota.

[¶ 7] Section 51–28–02, N.D.C.C., prohibits the placement of telephone calls using an automatic dialing-announcing device except in certain enumerated instances:

A caller may not use or connect to a telephone line an automatic dialing-announcing device unless the subscriber has knowingly requested, consented to, permitted, or authorized receipt of the message or the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered. This section and section 51–28–05 do not apply to a message from a public safety agency notifying a person of an emergency; a message from a school district to a student, a parent, or an employee; a message to a subscriber with whom the caller has a current business relationship; or a message advising an employee of a work schedule.

The calls placed by FreeEats to North Dakota residents in 2004 did not fit under any of the exemptions in N.D.C.C. § 51–28–02.

[¶ 8] FreeEats contends, however, that application of N.D.C.C. § 51–28–02 to interstate calls is preempted by 47 U.S.C. § 227, the Telephone Consumer Protection Act of 1991 ("TCPA"). The TCPA prohibits calls to a residential telephone line using an artificial or prerecorded voice without the recipient's prior express consent, "unless the call is initiated for emergency purposes or is exempted by rule or order by the [Federal Communications] Commission under paragraph (2)(B)." 47 U.S.C. § 227(b)(1)(B). Under paragraph (2)(B), the FCC is authorized to exempt calls that are not made for a commercial purpose. 47 U.S.C. § 227(b)(2)(B)(i). The FCC has adopted a regulation exempting calls not made for a commercial purpose from the TCPA's general prohibition on calls using an artificial or prerecorded voice message. 47 C.F.R. § 64.1200(a)(2)(ii) (2005). FreeEats contends the political polling calls at issue in this case were not made for a commercial purpose, and were therefore permissible under federal law.

### A

[¶ 9] The crux of this case lies in the interpretation of the TCPA's "savings clause," 47 U.S.C. § 227(e)(1):

(1) State law not preempted

Except for the standards prescribed under subsection (d) of this section and subject to paragraph (2) of this subsection, nothing in this section or in the

regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

 (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

 (B) the use of automatic telephone dialing systems;

 (C) the use of artificial or prerecorded voice messages; or

 (D) the making of telephone solicitations.

[¶ 10] The parties offer conflicting interpretations of the statute, centering upon the scope of the term "intrastate." The State contends the language of the statute is clear and unambiguous, and the term "intrastate" modifies only "more restrictive ... requirements or regulations," and does not modify "which prohibits." The State argues that the TCPA therefore expressly permits application of state statutes which prohibit certain classes of calls placed with automatic dialing systems or which use artificial or prerecorded voice messages to interstate calls placed to North Dakota residents. FreeEats argues the legislative history of the TCPA indicates Congressional intent to preempt state regulation of interstate calls, and therefore urges that the term "intrastate" must be read as applying to the phrase "which prohibits." Thus, FreeEats contends, the TCPA preempts any attempt by a state to either regulate or prohibit interstate calls which employ automatic dialers or prerecorded messages.

[¶ 11] In interpreting the statute, we are guided by well-settled rules of federal statutory construction. When the language of a statute is plain, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Dodd v. United States*, 545 U.S.

353, ——, 125 S.Ct. 2478, 2483, 162 L.Ed.2d 343 (2005) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)); *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Hartford*). The "preeminent canon of statutory interpretation" requires that courts "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)); *see Dodd*, at 2482 (quoting *Connecticut Nat'l Bank*). The court's inquiry "begins with the statutory text, and ends there as well if the text is unambiguous," *BedRoc*, at 183, 124 S.Ct. 1587, and courts and administrative agencies must give effect to the unambiguously expressed intent of Congress. *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

[¶ 12] The Supreme Court has concluded that "vague notions of a statute's 'basic purpose' are ... inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 220, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). It is not a court's function "to find reasons for what Congress has plainly done," but rather the court's job is to "avoid rendering what Congress has plainly done ... devoid of reason and effect." *Great–West*, at 217–18, 122 S.Ct. 708. It is for Congress, not the courts, to amend a statute if the plain language of the statute does not accurately reflect the true intent of Congress. *See*

*Dodd,* 125 S.Ct. at 2483. As noted by the Supreme Court in *Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (citation omitted) (quoting *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,* 516 U.S. 264, 279, 116 S.Ct. 637, 133 L.Ed.2d 635 (1996) (Scalia, J., concurring)), when construing a statute a court must "begin by examining the text, not by 'psychoanalyzing those who enacted it.'"

▬ [¶ 13] The TCPA savings clause expressly exempts from preemption "any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits" unsolicited fax advertisements, use of automatic dialers, use of artificial or prerecorded voice messages, or making of telephone solicitations. 47 U.S.C. § 227(e)(1). The State contends that the use of the disjunctive "or," preceded by a comma, indicates the word "intrastate" in the first clause does not modify the second clause. FreeEats essentially ignores the language of the statute and bases its argument upon the contention that the legislative history demonstrates Congressional intent to preempt all state statutes affecting interstate calls.

▬ [¶ 14] The word "or" is disjunctive in nature and ordinarily indicates an alternative between different things or actions. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 338–39, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Christl v. Swanson,* 2000 ND 74, ¶ 12, 609 N.W.2d 70; *Narum v. Faxx Foods, Inc.,* 1999 ND 45, ¶ 20, 590 N.W.2d 454. Terms or phrases separated by "or" have separate and independent significance. *Reiter,* at 338–39, 99 S.Ct. 2326. Coupled with the comma preceding "or," which indicates a separate clause, the statutory language clearly creates two distinct and independent phrases. Thus, read logically and grammatically, the statute states that nothing in the TCPA preempts any state law "that imposes more restrictive

intrastate requirements or regulations on" the enumerated classes of calls, and nothing in the TCPA preempts any state law "which prohibits" calls within the enumerated list. "Intrastate" unambiguously modifies only the first clause, not the second. If Congress had intended that the second part of the statute apply only to intrastate calls, "it could simply have said that." *Great–West,* 534 U.S. at 218, 122 S.Ct. 708. Because the statutory text is unambiguous, our inquiry into its meaning ends there. *BedRoc,* 541 U.S. at 183, 124 S.Ct. 1587.

[¶ 15] FreeEats contends that, even if the statutory language is clear, a literal interpretation of the statute would create an absurd result. *See Dodd,* 125 S.Ct. at 2483; *Lamie,* 540 U.S. at 534, 124 S.Ct. 1023. Specifically, FreeEats argues it is illogical to allow states to adopt more restrictive regulations on only intrastate calls, but to allow wholesale prohibition of certain classes of both intrastate and interstate calls.

[¶ 16] FreeEats contends that one important policy basis for enactment of the TCPA was to alleviate the excessive burdens which might be placed upon interstate telemarketers if they were required to comply with a plethora of conflicting regulations from all fifty states. In this context, there may be a substantial difference between the effect of state laws which seek to impose voluminous regulations upon interstate calls and those which wholly prohibit a specific class of interstate calls. The TCPA and corresponding regulations govern many diverse aspects of such calls. For example, under the relevant federal regulation, telephone solicitations may only be made to a residential telephone customer between 8 a.m. and 9 p.m. local time. 47 C.F.R. § 64.1200(c)(1). It is foreseeable that, if each state adopted differing time restrictions on telemarket-

ing calls, it may be difficult for a telemarketer to adjust its equipment to place calls to the various states only within a particular state's permissible hours. The states could conceivably create a stream of inconsistent and conflicting regulations on innumerable aspects of telemarketing calls, thereby making compliance with each individual state's unique set of rules and regulations burdensome.

[¶ 17] By contrast, it would be a relatively simple matter for a telemarketer to comply with a state statute which wholly prohibits certain enumerated classes of calls. When contemplating placing a certain type of call, the telemarketer need only review state law to determine if such calls are prohibited in a particular state. If so, it is presumably an easy task for the telemarketer to refrain from placing calls to that state's residents. *See Utah Div. of Consumer Prot. v. Flagship Capital,* 2005 UT 76, ¶ 22, 125 P.3d 894 ("the record does not reflect that a national telemarketer would confront any substantial hardship by being required to determine which of its calls reach the telephones of Utah residents").

[¶ 18] We conclude that a literal interpretation of the unambiguous language of the statute does not lead to an absurd result. *See Dodd,* 125 S.Ct. at 2483; *Lamie,* 540 U.S. at 534, 124 S.Ct. 1023. We therefore interpret the express language of 47 U.S.C. § 227(e)(1) to provide that the TCPA does not preempt any state law which prohibits interstate calls using automatic telephone dialing systems or using artificial or prerecorded voice messages. We must review FreeEats' claim of federal preemption within the context of this interpretation of the TCPA.

B

[¶ 19] Under the Supremacy Clause, U.S. Const. art. VI, the laws of the United States are the "supreme law of the land," and state law that conflicts with federal law is without effect. *Home of Economy v. Burlington N. Santa Fe R.R.,* 2005 ND 74, ¶ 5, 694 N.W.2d 840. In *Home of Economy,* we quoted the United States Supreme Court's outline of the parameters of federal preemption under the Supremacy Clause:

First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.

Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be " 'clear and manifest.' "

Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Home of Economy,* at ¶ 5 (quoting *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)). Thus, federal preemption analysis includes three components: express preemption, field preemption, and conflict preemption.

[¶ 20] Because of the "interstitial nature of Federal law," preemption of state law is not favored, and the framework for analyzing a preemption claim under the Supremacy Clause begins with the basic assumption that Congress did not intend to displace state law. *Billey v. North Dakota Stockmen's Ass'n,* 1998 ND 120, ¶ 28, 579 N.W.2d 171 (quoting *Federal Land Bank of St. Paul v. Lillehaugen,* 404 N.W.2d 452, 455 (N.D. 1987)); *see also Home of Economy,* 2005 ND 74, ¶ 6, 694 N.W.2d 840. The United States Supreme Court has expressly noted that, because "the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt" state law. *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 125 S.Ct. 1788, 1801, 161 L.Ed.2d 687 (2005) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). Although the assumption that Congress did not intend to displace state law is not ordinarily triggered when a state statute touches upon an area where there has been a history of significant federal presence, where the state acts in a field that states have traditionally occupied, the assumption that the state's historic police powers are not superseded by federal law applies unless Congress clearly and manifestly expresses a contrary intent. *Home of Economy,* at ¶ 6.

[¶ 21] It has long been recognized that the police power of a state extends beyond the health, morals, and safety of the community, and encompasses the duty to protect the privacy of its citizens, including the authority to protect the peaceful enjoyment of the home and the well-being and tranquility of the community. *See Hynes v. Mayor and Council,* 425 U.S. 610, 619, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Breard v. City of Alexandria,* 341 U.S. 622, 640, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); *Thornhill v. Alabama,* 310 U.S. 88, 105, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). This authority includes the power to enact laws regulating or prohibiting interstate telemarketing practices. *See Flagship Capital,* 2005 UT 76, ¶¶ 19–20, 125 P.3d 894. Furthermore, the United States Court of Appeals for the Eighth Circuit, in a case upholding the constitutionality of the North Dakota Telephone Solicitations Act, N.D.C.C. ch. 51–28, the statute involved here, noted that "residential privacy is a 'significant' government interest, particularly when telemarketing calls 'are flourishing, and becoming a reoccurring nuisance by virtue of their quantity.'" *Fraternal Order of Police v. Stenehjem,* 431 F.3d 591, 597 (8th Cir.2005) (quoting *Van Bergen v. Minnesota,* 59 F.3d 1541, 1555 (8th Cir.1995)). In concluding that a Utah statute regulating telemarketing was not preempted by the TCPA, the Supreme Court of Utah held that, "[w]here the police power is at issue, there is a presumption that the regulations can constitutionally coexist, with a resulting burden of proof placed on the party claiming preemption." *Flagship Capital,* at ¶ 20 (citing *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 716, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). As noted by the United States Supreme Court, when considering preemption a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.,* 536 U.S. 424, 432, 122 S.Ct. 2226, 153 L.Ed.2d

430 (2002) (quoting *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 605, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)).

[¶ 22] We thus begin our analysis with the assumption that Congress did not intend the TCPA to abrogate statutes implementing the state's police power to protect its citizens' privacy and peaceful enjoyment of their homes, and FreeEats, as the party claiming preemption, bears the burden of proving it was the clear and manifest intent of Congress to supersede state law. *See Bates,* 125 S.Ct. at 1801; *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Billey,* 1998 ND 120, ¶ 28, 579 N.W.2d 171; *State v. Liberty Nat'l Bank & Trust Co.,* 427 N.W.2d 307, 310 (N.D.1988). The "ultimate touchstone" of preemption analysis is Congressional intent. *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608 (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). When Congress has expressly addressed preemption in the federal statute, the question whether the federal law preempts state law necessarily is largely a matter of statutory construction. *Home of Economy,* 2005 ND 74, ¶ 6, 694 N.W.2d 840; *Billey,* at ¶ 28; *Liberty Nat'l,* at 310 (quoting L. Tribe, American Constitutional Law § 6–25, at 480 (2d ed. 1988)). In such cases, the plain wording of the statute "necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine,* 537 U.S. 51, 62–63, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).

### C

[¶ 23] As previously noted, there are three forms of federal preemption: express preemption, field preemption, and conflict preemption. Express preemption arises when Congress has explicitly de-fined the extent to which its enactment preempts state law. *English,* 496 U.S. at 78, 110 S.Ct. 2270; *Home of Economy,* 2005 ND 74, ¶ 5, 694 N.W.2d 840. There is no provision in the TCPA which explicitly states that the federal statute was intended to preempt state laws prohibiting certain classes of interstate calls. Rather, the federal act includes a provision explicitly stating that such state laws are *not* preempted by the TCPA. *See* 47 U.S.C. § 227(e)(1). There is no express preemption in this case.

### D

[¶ 24] FreeEats contends that the pervasive and comprehensive scope of the TCPA evidences Congressional intent to fully occupy the field and preempt any and all state laws attempting to regulate or prohibit interstate telemarketing calls.

[¶ 25] Field preemption occurs when Congress intends federal law to occupy the entire field covered by the federal statute, to the exclusion of state regulation of the same subject matter. *English,* 496 U.S. at 79, 110 S.Ct. 2270; *Home of Economy,* 2005 ND 74, ¶ 5, 694 N.W.2d 840. Such an intent may be inferred when the scheme of federal regulation is so pervasive as to create an inference that Congress left no room for the states to supplement it, or when the federal interest in the field is so dominant that it will be assumed to preclude enforcement of state laws on the same subject. *English,* at 79, 110 S.Ct. 2270; *Home of Economy,* at ¶ 5. Where the field to be preempted encompasses areas that have been traditionally occupied by the states through their police power, congressional intent to displace state law must be "clear and manifest." *English,* at 79, 110 S.Ct. 2270 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)); *Home of*

*Economy*, at ¶ 5; *see also Ours Garage*, 536 U.S. at 432, 122 S.Ct. 2226.

[¶ 26] In *Flagship Capital*, 2005 UT 76, ¶ 18, 125 P.3d 894, the court expressly rejected the notion that the federal interest in regulating interstate telemarketing is so dominant that it supersedes all state laws touching the issue:

> While it is unquestioned that telemarketing is national, in fact global, in its scope, this confluence of commerce and technology, despite its power to inspire widespread annoyance and worse, throughout our nation, has not necessarily thereby created an exclusive federal interest. The Supreme Court has stated that "every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law." *Hillsborough County v. Automated Labs., Inc.*, 471 U.S. 707, 716, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). An apt analogy is the regulation of interstate highways. There, the interstate nature of the field is so undisputable that the subject has the word "interstate" in its name. However, this does not mean that federal interests dominate in the regulation of this interstate system. Instead, most of the regulation of the highways is left to the individual states to regulate through their police power to protect their citizens' health, welfare, and safety. Interstate telemarketing fits a similar niche. Like interstate highways, there is a federal interest, as illustrated by the TCPA, to define the basic parameters within which interstate telemarketing may occur. Within those walls, however, the states are left with discretion to determine whether the welfare of their citizens requires greater protection and to act on that determination.

[¶ 27] Similarly, the United States Supreme Court in *Hillsborough*, 471 U.S. at 717, 105 S.Ct. 2371, concluded that the comprehensive nature of federal law on a subject does not necessarily mean states are barred from imposing additional requirements:

> In *New York Dept. of Social Services v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973), the Court stated that "[t]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *Id.*, at 415, 93 S.Ct., at 2514. There, in upholding state work-incentive provisions against a preemption challenge, the Court noted that the federal provisions "had to be sufficiently comprehensive to authorize and govern programs in States which had no . . . requirements of their own as well as cooperatively in States with such requirements." *Ibid.* But merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the field.

[¶ 28] The inclusion in a federal act of a specific, limited preemption provision is a clear expression of Congressional intent that federal law was not meant to wholly preempt state law in this field. *Billey*, 1998 ND 120, ¶ 31, 579 N.W.2d 171. The United States Supreme Court recognized in *Cipollone*, 505 U.S. at 517, 112 S.Ct. 2608:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," *Malone v. White Motor*

*Corp.*, 435 U.S., at 505, 98 S.Ct., at 1190, "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. *California Federal Savings & Loan Assn. v. Guerra*, 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.).

[¶ 29] The United States Court of Appeals for the Eighth Circuit has expressly held that there was no intent by Congress to create field preemption under the TCPA:

> The TCPA carries no implication that Congress intended to preempt state law; the statute includes a preemption provision expressly not preempting certain state laws. If Congress intended to preempt other state laws, that intent could easily have been expressed as part of the same provision. Further, the preemption provision makes it clear that Congress did not intend to "occupy the field" of ADAD regulation, *see Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or to promote national uniformity of ADAD regulation, as it expressly does not preempt state regulation of intrastate ADAD calls that differs from federal regulation.

*Van Bergen*, 59 F.3d at 1548.

[¶ 30] The TCPA includes explicit provisions stating the TCPA was not intended to preclude enforcement of all state laws within its subject matter. *See* 47 U.S.C. § 227(e)(1). In fact, 47 U.S.C. § 227(e)(1) is expressly titled "State law not preempted." *See Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 184 S.W.3d 707, 718 (Tex.2006). The TCPA also contains a provision reserving the right of state officials to bring actions in state courts "on the basis of an alleged violation of any general civil or criminal statute of such State." 47 U.S.C. § 227(f)(6). The statutory language of the TCPA clearly expresses the intent of Congress that the TCPA was not meant to wholly occupy the field within its subject matter, and was not intended to preempt all state law affecting the same subject. We conclude there is no field preemption in this case.

E

 [¶ 31] The final prong of preemption analysis is conflict preemption. Conflict preemption may be found to exist "where it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English*, 496 U.S. at 79, 110 S.Ct. 2270 (citation omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)); *Home of Economy*, 2005 ND 74, ¶ 5, 694 N.W.2d 840 (quoting *English*).

 [¶ 32] FreeEats has failed to meet its burden of demonstrating that application of N.D.C.C. § 51–28–02 to interstate political polling calls would make it impossible for a private party to comply with both federal and state law. In analyzing such "actual conflict" preemption, the United States Supreme Court has used the example of a state law that would "premis[e] liability upon the presence of the very windshield retention requirements that federal law requires." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 871–72, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). There has been no showing that a telemarketer's compliance with the prohibitions in N.D.C.C. § 51–28–02 would place it in direct noncompliance with the TCPA. In the context of this case, FreeEats would not have violated any provision in the TCPA if it had complied with North Dakota law and refrained from placing calls to North Dakota residents.

[¶ 33] FreeEats argues that there is an actual conflict between federal and state law because "FreeEats · can conform to both sets of requirements only by forsaking the federally recognized right to use prerecorded messages when making interstate polling calls to residents of North Dakota." In addition to being premised upon a misreading of the clear and unambiguous language of the TCPA's savings clause, FreeEats' contention ignores the "interstitial nature" of federal law. *See Billey,* 1998 ND 120, ¶ 28, 579 N.W.2d 171. States are generally free to complement federal law by identifying additional local needs and imposing further regulations. *See Hillsborough,* 471 U.S. at 717, 105 S.Ct. 2371. A federal statutory prohibition of certain conduct does not automatically create an overarching right to engage in all conduct not expressly prohibited by the statute.

[¶ 34] Addressing whether the TCPA preempts application of state telemarketing laws to interstate telemarketing calls, the Supreme Court of Utah reasoned:

> Close examination of the Utah laws shows that they are not in conflict with the TCPA, nor do they stand as an obstacle to the accomplishment and full objective of federal law. We see no reason why telemarketing companies would be unable to comply with both the Utah laws and the federal statutes. This intention of the Utah legislature is made clear by Utah Code section 13–25a–103(4), which reads: "A person may not make or authorize a telephone solicitation in violation of Title 47 U.S.C. 227." The telemarketing standards set by our legislature are stricter than, but do not directly conflict with, the federal standards. A telemarketer who complies with the Utah standards will have little difficulty complying with the federal standards. Moreover, the record does not reflect that a national telemarketer would confront any substantial hardship by being required to determine which of its calls reach the telephones of Utah residents. Therefore, the Utah law does not force a telemarketer to conform its nationwide practices with Utah standards in order to prevent an inadvertent violation. The telemarketer can simply identify those calls that would be made to Utah and choose to not make those calls or to conform those calls to the Utah regulations. That the TCPA creates a uniform nationwide minimum set of prohibited telemarketing activities does not mean that Utah's heightened standard for companies wishing to make phone calls to this state conflicts with the federal scheme.

*Flagship Capital,* 2005 UT 76, ¶ 22, 125 P.3d 894 (footnote omitted); *see also Chair King,* 184 S.W.3d at 718 ("Congress clearly did not intend the TCPA to establish a ceiling if states decided to be more aggressive in their approach").

[¶ 35] Similarly, we conclude FreeEats has failed to demonstrate that application of N.D.C.C. § 51–28–02 to interstate political polling calls would stand as an obstacle to the accomplishment of the full purposes of Congress in enacting the TCPA. When Congress has addressed preemption in the federal statute, preemption is necessarily a question of statutory construction, *Home of Economy,* 2005 ND 74, ¶ 6, 694 N.W.2d 840, and where Congress has expressed its intent in reasonably plain terms the language of the statute is ordinarily regarded as conclusive. *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993). Here, the plain language of 47 U.S.C. § 227(e)(1) demonstrates that it was not within the full purposes of the TCPA to prevent states from prohibiting certain interstate telemarketing calls.

[¶ 36] FreeEats argues that the United States Supreme Court's decisions in *Geier,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d

914 (2000) and *United States v. Locke*, 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), make it clear that statutory savings clauses do not insulate state enactments from preemption analysis. *See also Sprietsma*, 537 U.S. at 65, 123 S.Ct. 518. The Court in those cases recognized that inclusion of a savings clause in a federal statute does not bar the ordinary working of conflict preemption principles. *See Sprietsma*, at 65, 123 S.Ct. 518; *Geier*, at 869, 120 S.Ct. 1913. The Court did not, however, hold that the language Congress employed in a savings clause is wholly immaterial to preemption analysis. The Court merely rejected the notion that inclusion of a savings clause created a "special burden" beyond that inherent in ordinary preemption principles, and concluded state law may be found preempted by federal law if there is an actual conflict with the federal objective. *See Geier*, at 870–72, 120 S.Ct. 1913.

[¶ 37] We do not read those cases as holding that a court may not consider the precise language of a savings clause when discerning the intent of Congress and the purpose of the federal act when determining whether conflict preemption is present. In each of those cases, the Court was required to determine whether conflict preemption existed when there were inconsistent and conflicting preemption provisions and savings clauses within the federal statutes. They did not involve, as this case, an express provision explicitly providing that nothing in the federal statute "shall preempt any State law" on the precise subject matter involved in the case.

[¶ 38] We have analyzed the preemption question under ordinary conflict preemption principles. In doing so, we have attempted to discern the intent of Congress and to give effect to the purposes underlying the TCPA. We have found Congressional intent and the resulting purpose of the statute in the clear and unambiguous language of the statute. Where Congress has included an express provision granting states the power to enact laws prohibiting the use of automatic telephone dialing systems or artificial or prerecorded voice messages in interstate telemarketing calls, it cannot frustrate the intent of Congress when the state acts within the terms of that grant.

[¶ 39] In defining express preemption, the United States Supreme Court has held that "[p]re-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English*, 496 U.S. at 78–79, 110 S.Ct. 2270 (citation omitted). Although this rule is ordinarily applied in situations where Congress has expressly declared that certain state laws are preempted, we see no reason why it does not apply with equal force when Congress clearly and unambiguously states that certain state laws are *not* preempted by the federal act. In either case, the intent of Congress is clear from the statutory language, and the court's "easy" and solitary task is to enforce the statute according to its terms. We conclude Congress has clearly and unambiguously expressed its intent that the TCPA does not preempt application of a state statute prohibiting interstate telemarketing calls which use automatic dialing equipment or artificial or prerecorded voice messages.

[¶ 40] Our holding is in accord with the only other appellate decision expressly addressing this issue to date. *See Flagship Capital*, 2005 UT 76, 125 P.3d 894. FreeEats has drawn our attention to a recent federal trial court decision holding, in the context of interstate facsimile advertisements, that the TCPA's savings clause did not preclude preemption of California's attempt to regulate interstate fax advertising. *Chamber of Commerce v. Lockyer*,

2006 WL 462482 (E.D.Cal. Feb.27, 2006). The court's decision in *Lockyer* was premised upon its conclusion that the presumption against preemption does not apply and upon a strained reading of the language of 47 U.S.C. § 227(e)(1). We decline to follow *Lockyer*.

### IV

[¶ 41] We have considered the remaining issues and arguments raised by the parties and they are either unnecessary to our decision or are without merit. We affirm the judgment.

[¶ 42] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., and WILLIAM F. HODNY, Surrogate Judge, concur.

[¶ 43] The Honorable WILLIAM F. HODNY, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.